I want to assure everyone we're better organized than we appear. We'll welcome all and good morning. Our first case this morning is Rao v. Rusch. Ms. Major. Good morning. May it please the court, Ruth Major, on behalf of the appellant Dr. Jasti Rao. The right to impeach a witness is a fundamental component of a party's First Amendment due process rights, including in a civil case. It is especially important when the witness who's testifying is... I'm puzzled, counsel, by why you start with the Constitution. We have an elaborate set of rules of evidence and doctrines for how district judges have to run their trials. Are you saying that those doctrines and rules are unconstitutional and you have to leap to the Constitution because the rules of evidence offer you no support? Well, the rules of evidence, 607 and 608, do provide that my client had a right to impeach the witness. So why don't you start with the rules of evidence? It's a fundamental doctrine that courts never turn to the Constitution unless it's absolutely necessary. Now, I thought maybe you didn't start with the rules of evidence because the rules of evidence require an offer of proof, which apparently wasn't made. There was an offer of proof made, Your Honor. Several offers of proof were made as to the testimony of Dr. Santoro. And we've cited in our briefs to the record of where those offers of proof were made. There was one made, it's docket number 331, page 2, and there was another offer of proof as to Dr. Santoro's testimony, same docket 331, I'm sorry, docket 331, page 4. There were two offers of proof made during trial that Dr. Santoro would have testified that he told nothing to Dr. Rush that was adverse to Dr. Rao, and what he told Dr. Rush was that only positive information came out about Dr. Rao, and that really concerning information came out about Dr. Gandhi, and that he was concerned about Dr. Gandhi. So your view is, this is completely covered by the rules of evidence. Well, it's covered by the rules of evidence. And I'm totally mystified about why you lead with the Constitution. Well, Your Honor. Usually lawyers lead with the Constitution when they're lazy and they're not researching their real arguments. Well, Your Honor, if it's a violation of the rules, then arguably it's to the discretion of the trial court. But when it rises to the level where a party is completely... Gee, has the Supreme Court ever said that in a civil case? Well, I believe that the decisions of the court... In a civil case is guaranteed by the Constitution, even when not by the rules of evidence. Has that ever been held? Well, parties do have a right to impeach others. I'm asking a concrete question. Has the Supreme Court ever held that? Have we ever held that? Well, I did cite to a case in our brief, which is Green v. Bakkelandry, that addresses that the Fifth Amendment applies equally to civil litigants, both plaintiffs and defendants, and that addresses an issue of impeaching a witness. So I believe that that case stands for the proposition... No, it doesn't. Not remotely, but there's no need to get into that. Well, Dr. Rao was denied a right to impeach a party in this case who was testifying about an issue that was material to the case he was required to prove. And even under an abuse of discretion standard, which is whether a reasonable person could accept that view or could find that... Or whether that view is reasonable, it wasn't. It's fundamental and it's basic, and I believe probably every citizen in this country knows it, that when there's a trial and one witness testifies about something that's important to the case, material, the other side gets a chance to test that. That is fundamental, whether it's under the Constitution or it's under the federal rules which allow for impeachment. It was either a violation of the Constitution or it was an abuse of discretion.  We were not even allowed to ask Dr. Rush, what did Dr. Santoro say horrified him? What was the content of his statements? She testified that based on what he said, she referred these anonymous allegations to the ethics officer, and we were not allowed to let the jury know what he supposedly told her either through Dr. Rush or through the witness we wanted to call, Dr. Santoro, who would have said, nothing I said should have led her to make that decision. Was he offered as a rebuttal witness? Your Honor, after Dr. Rush testified, there was no more testimony on this issue because we went into the defense case and the defense called no witnesses and presented no evidence on it. So this was the time, it was the testimony of Dr. Rush, and we weren't allowed to cross-examine her on what was said at all, and we weren't allowed to call Dr. Santoro at that time. Judge Kendall said, there's no proper basis to call this witness to impeach Dr. Rush. You can't do it. Initially, she said we couldn't do it at the pretrial conference because she said, this committee's investigation didn't relate to the ethics issues. That was the finding there. At trial, it was hearsay. That was the basis. But if Dr. Rush testified that she made this decision based on the discussion with Dr. Santoro, that goes to her state of mind, and we should be permitted to bring out that evidence to show what was the statement and does it support that that affected her state of mind, and we were never allowed to do that. Under the rules, under the Constitution, that is improper. It's an abuse of discretion and it is a violation. Even civil litigants have a right to impeach witnesses in a trial, and that's consistent with this court's decision in Green v. Bach-Laundrie. The Supreme Court decided Green against Bach-Laundrie. I'm sorry. The Supreme Court's decision in Green v. Bach-Laundrie. So essentially, and just to be clear, the testimony was, Dr. Rush's testimony was that these individuals gave her information that horrified them. This is what the jury heard, but the jury was never allowed to hear the content of that information. And this case is about, that was the event where anonymous allegations, Dr. Rush had testified, I didn't know whether these allegations were true or whether they were just being made by a disgruntled employee. And she did testify that she certainly knew many of the allegations were false. She knew that even when she received them, that many of them were false. The anonymous source identified three research papers that he said had errors. She had another doctor look at them, and he said they were excellent. So this was the step where Dr. Rush was supposedly deciding whether she was going to advance these allegations against this tenured, very successful researcher who ran the brain cancer lab at the University of Illinois. He opened it. He got the funding for it. He brought in millions of dollars to the University of Illinois. This was the point where Dr. Rush was making a decision, do I end it here or do I advance it to the ethics officer? And she claimed to have done it based on what Dr. Santoro told her, but the jury was never allowed to know what Dr. Santoro told her. And under any standard, that is not acceptable. We also raised an issue as to the jury instructions. And the concern with the jury instructions is that under federal law, you can have a Section 1983 due process violation. You don't have to show that the defendant actually participated in all the acts. If they turned a blind eye to it or condoned it or were engaged in that type of activity, it can support a claim for Section 1983 due process. And that was Judge Kendall's ruling at summary judgment, that that's true. What is a blind eye instruction? Well, we refer to it sort of as a blind eye instruction, but it's an instruction that the first part of the instruction is that the defendant knowingly deprived Dr. Rao of a protected property interest. So the instruction defined what knowingly means. So the jury understands it doesn't have to be that they actually engaged in the activity, but they could have turned a blind eye to it, they could have condoned it. There's many different types of conduct that could support a finding that the violation was knowingly. But the problem with the jury instruction is that this knowingly definition, which allows for condoning, approving, or turning a blind eye, which is knowing it and just pretending like obviously it's not there, I'm sure you're familiar with that. The problem is that that definition was only applied, only used knowingly in the very first element of the jury instruction. The second element sort of refers to it. It says they did so either by constructively discharging, so it sort of somewhat ties into knowingly. But the third element of that instruction, which is that they failed to provide him due process in the form of notice and the opportunity to be heard. That element, which is really critical here because that's what the claim was, big part of the claim, that element wasn't tied to the knowingly definition at all. It didn't refer to knowingly, it didn't refer to condoning or turning a blind eye or anything. And in order for this jury instruction to be in accord with federal law, it would have to be clear to the jury that that third element could also involve the defendants condoning it or turning a blind eye to it or approving it. But the judge only had knowingly in the first element. And each of those must be proved. So we assume or presume that a jury is going to follow the instructions that are given to them by the court. So we can assume here that the jury had the wrong instructions. And accordingly, Dr. Rao was not given the benefit of the jury understanding that the defendants didn't have to actively participate in denying him notice. And in denying him an opportunity to be heard. And that's why it was not in accordance with federal law. We asked that it be rephrased so that it would cover all three elements. And the court denied our request. The third issue has to do with the state of mind evidence. The defendants brought in a lot of evidence about Dr. Rao's legal gambling activities. There was no evidence that Dr. Rao didn't perform his job. He had stellar reviews for 12 years he was there, outstanding every year. He did a terrific job, brought in a lot of money, built this clinic. It was the crown jewel of the Peoria campus. They got a lot of attention. He had just been named Peorian of the Year. He was very accomplished and very successful and very hard working. His outlet that he chose was legal gambling. He didn't use the university's money to gamble. He didn't not do his job. And there'll be issues raised about the papers, but that was another issue we couldn't even get into. There's so much evidence that the supposed errors that they claim they found in his papers weren't errors at all. That you'll hear them talk about errors. But most of the papers that they claimed had errors, after he left, they never followed through to correct. And they never took action against a single other person. They had people testify, yeah, I made a mistake, I used two of the same slides on accident. I should have used, I had a different slide to use, but I made a mistake in compiling it. That was the evidence that was presented to the university. They never took action against a single one of the people who made the errors. Because they were all errors that were done in compilation of the papers. What was the source of the grants? Most of it was federal funding, NIH. A lot of federal money that he managed to attract. He did, he was one of the top- And that's how you rate people, how much money they can bring in. Well, it's a part of it. A lot of it. I'm sure it's a lot of it, yeah. And he, I mean, that's one of the issues. He had a lot of money, and when he left, they kept the money there, which is unprecedented. Usually, the money goes with the professor. They kept the money there. You mean the grant follows the professor? Normally, that was the testimony. That's normally what happens. And he also, so all that money that he brought in stayed at the university. But he left, and then it was under the control of his supervisors. So, with a state of mind, on the March 21st, 2013 meeting, he was called in and, for the first time, told that he was, that they were going to, they actually told him they were going to terminate his employment on Monday. That was his testimony. It was a, I think it was a Thursday meeting. And they told me he couldn't go back to the campus anymore. He couldn't access the property. He couldn't do any of that. Even though, as a tenured professor, he had a right to have hearings, that the testimony was usually takes, honestly, two to three years to get through. But they told him they were going to basically bypass all that. They would announce allegations against him that we were fraudulent. So, they presented evidence. What they tried, what they did was a trial. They presented evidence of this gambling. He never gambled more than he earned. In fact, his worst year of gambling, he earned $300,000 more than he gambled. He was, I think, the fourth highest paid person at the University of Illinois. He made, like, what, $800,000 a year? Well, so maybe, yeah, so maybe his worst year, he, I think one year, honestly, he had very high gambling, but it was 600,000 and excess or more every year. Because I think, I can't, it was between seven and 800,000, I think. So he always had way more money than he ever gambled. And some years he won, some years he, it was, but in his worst year with a loss, he earned way more, so it wasn't like he was in need of money. But in any event, they presented this gambling evidence, which was never known to the university, all these records and everything at the time they had that March 21st meeting. We wanted to present evidence of information that he had as well, and they prohibited us from bringing that evidence in. So only the state of mind that they presented was there. And finally- Do you want to say something? I know, I do. Okay, I will. And I don't want to cut you off. No, that's fine. Thank you. Thank you, Mr. Major. Ms. Mazura? May it please the court? I'll address the three issues that counsel spoke about. Relating to, first of all, the Santoro issue. There was no, in terms of Dr. Santoro's so-called impeachment testimony, never, never appropriately preserved. In fact, when you look at the record on this, at R108, you see the judge trying to get the reason that the Santoro testimony is being offered. And Ms. Major says, given the testimony today, where Dr. Rush testified about where Dr. Santoro had told her what came out in the dean's committee, and that prompted her to take action, we would like to call Dr. Santoro. And the court asks, as appropriate, what are you saying that Dr. Santoro is going to dispute with Dr. Rush? Ms. Major, he's going to dispute that he had identified any problems with Dr. Rao, and that the only problems he identified were problems with Dr. Gandhi. So she's using that to try to explain why she took the action she took, because Dr. Santoro and Dr. DeAlecan came and talked to her, and were being prevented from calling Dr. Santoro. Your Honor, this is nothing about impeachment. It did his testimony. In fact, if you dig through the record and look at his deposition testimony, referred to in our briefs, you will see Dr. Santoro saying, I do not remember what I said to Dr. Rush. So where is the impeachment here? He cannot contradict what he does not remember. So this claim that there's going to be impeachment by Dr. Santoro, it doesn't exist. It is based on nothing. So that is not preserved, and again, I would suggest that your clerks look at Exhibit EE, which is a Santoro testimony. I spent a lot of time digging through this record, so I can sympathize with them. Now, in terms of the jury instructions, what the problem with the claim on the jury instructions is that it fails to consider that jury instructions are to be looked at as a whole. So the jury instructions are listed in the record starting at page 120, and you don't just see the one jury instruction standing alone. You see a number of jury instructions. I'm sorry, 108 is where the argument is, I apologize. The actual jury instruction starts at R174. And you see the judge explaining that to succeed on the claim, you must prove by preponderance of the evidence that Dr. Rush and Dr. Azar knowingly deprived Dr. Rao of a protected property interest. Two, they did so by either constructively discharging him or coercing him to resign. And they failed to provide him due process. Then, if you find that the plaintiff has proved this by a preponderance of the evidence, then you must fine for the plaintiff. However, if you find that the plaintiff did not prove this by a preponderance, then you must fine for Dr. Rush or Dr. Azar, whichever defendant you are considering at the time. Then go back down on 175. A defendant knowingly deprives another of his right to due process when he or she is personally involved in the conduct that the plaintiff complains about. Or when he or she sets in motion a series of events that he or she knew reasonably should have known would cause others to deprive the plaintiff of his right to due process. And then here comes the blind eye instruction, right after that on page 176, a defendant can be personally involved if he or she knows about the conduct and facilitates it, approves it, condones it, or turns a blind eye to the conduct for fear of what he or she might see. There is the blind eye instruction right there, right in the group of explaining what a violation of due process is. The jury was instructed about this. The jury is not stupid, and the jury can hear all the instructions. And as this court has ruled, we must look at all of the instructions, not pull out the one instruction. And by the way, there was no offer made by the plaintiff to include blind eye in each of the elements, never offered. What they wanted to do was make it into a passive voice. So apparently, anyone walking across the University of Illinois campus who might have made a complaint, and then it turned into various investigations which resulted in a termination, would somehow be held liable. The way that they want the due process explained is completely contrary to the law, as we set forth in our briefs, as well as this court's own pattern jury instruction, 702, which talks about personal involvement. And what the judge, as you see her talk, explained herself at 120, that's what she was struggling with, that's what she was trying to explain. And she wanted to make it very clear to the jury that there had to be personal involvement, but they could set a series of events in process that they reasonably thought might result in harm, and you could fine for that. And the jury was told that, and the jury found there was no such harm. In terms of the state of mind evidence, not mentioned in the notice of appeal anywhere. The state of mind does not appear at all in terms of, secondly, but even if this court forgives that, the state of mind evidence is not preserved at all. Indeed, in his initial brief, Dr. Rao claims he was denied an opportunity to present evidence at the trial, the very subject that defendants introduced into evidence in the first place, Rao's state of mind. When faced with the fact that they, that, and then he was going to put all this evidence in, of all these people, about everything that Gandhi did, what a bad employee he was. I'll leave aside the fact that it's not state of mind evidence. But when he was faced with the reality of that, then we get in the reply, we then say, oh no, I didn't mean, I didn't mean Dr. Rao's state of mind. What I really meant was the Kay Scholar's state of mind. So I'm not even sure which state of mind we're actually talking about, your honors. What they really wanted to do here was admit character evidence in violation of FRA 404. And if you look at the examples of the testimony quoted on page 40 of Plano's initial brief, they have nothing to do with Dr. Gandhi's truthfulness or untruthfulness. They have to do with that he had a bad reputation and that he had dishonesty and a general bad character. And then if you look at the reply at page 11, it says the issue before the court is whether Dr. Rao would be permitted to introduce evidence from numerous members of his lab and other university members, confirming that Dr. Gandhi had a reputation for being dishonest, divisive, and having a poor work ethic. That's what they really wanted to do. Dr. Gandhi was the whistleblower here. And the purpose of this evidence was to trash the whistleblower. This court cannot condone that or approve it. Let me say one last thing. The court found in summary judgment that what, this case was all about, can be basically summed up in the fact that we had a college professor at the University of Illinois, who was a gambler, who spent his time during the work day and night at the Paradise Casino in Peoria from late 2009 until he himself placed himself on the voluntary self-exclusion list for all casinos. After he resigned his employment. During this time, papers came out from the lab that Dr. Rao supervised while Rao was demanding cash payments from his subordinates, presumably to fund his gambling. In July of 2012, it is now 2018, the last time I checked, so this case has been going on a while. The issues in Dr. Rao's lab came to the attention of the supervisor. Two investigations after Dr. Rush determined that there was enough there that she had to go forward, and that the dean's committee determined, this dean's committee she got together, determined that there was enough there for her to go forward to the university, that's what she did. And the university took it from there. Two investigations, one by Kay Schuller on ethics, and a second investigation on research integrity. The judge dismissed basically all of the plaintiff's claims as to research integrity, making these, you know, Dr. Santoro's testimony about research integrity completely irrelevant and immaterial. And the focus at the trial was on ethics, was on the Kay Schuller investigation. In March of the following, March 21st of the following year, Kay Schuller told Dr. Rao of what the results of that lengthy investigation was. And the results were, is that they found that Dr. Rao had taken over $15,000 of salary, which was funded in part by federal grants, that were not taken away from Dr. Rao. Because the federal government determined who would get those grants, and that there was evidence submitted in the record that that is exactly what the university did. They asked the government, what should we do with these? And they determined whether they would stay with the university, with other researchers, or go elsewhere. How much money? How much, do you know the amount of grants that he brought in over all those years? You know, I do not recall, your honor, how many. Can you even estimate this? It's just weird, frankly. Several hundred thousand, at least. So there were a number, this was not, why would the University of Illinois want to terminate this guy, or get him to resign? They had no motivation on this. His supervisor, Dr. Rush, there were thousands of dollars worth of grants that he was responsible for. They did not go into this whole thing with malice at all. They hired investigators, white collar crime attorneys, went and did a months long investigation, and came to the conclusion that he was taking money from the people who worked for him, and that he, Warshad, when they asked him, how many papers do you think are at issue? He said, three, when at the very time that he said that, he knew there were many more, because he had his lab looking at the papers. He had evidence of them looking at the papers in terms of the computer, and he told his lab, destroy the evidence. So that's what Dr. Rao did, and that's why the university asked for his resignation, and that's why he gave it. He knew what would be revealed. I have nothing further. Well, I have, frankly, this is, I guess, a dumb question. No, nothing's a dumb question, Your Honor. Because with all this research, what were they trying to do? What were the results of this cancer research? Was there a cure? Was there something besides just getting more grants and people writing papers? Well, that's very interesting, Your Honor. The answer is, I don't know what the results were, because as far as I know, there were no results. And in fact, Dr. Brabner, when he did the research misconduct investigation, discovered that no other paper had ever cited anything coming out of Dr. Rao's lab. So whatever they were doing has never been used again. So that's why my answer to you respectfully is, I don't know. And my other answer would be, probably nothing. All right, thank you, Ms. Major. Thank you. Ms. Major. I'll start with the last point. The NIH doesn't give millions of dollars, and we're talking about millions of dollars here, to researchers who do nothing. Dr. Rao's lab published over 100 papers. They were all published in peer-reviewed journals, which means layers of people, three people that were selected, reviewed them carefully. And not one of the, I'm sorry, one paper of all of them was ever, I think, withdrawn. And that was the paper that Dr. Rao had learned about preceding all of these issues. And he was a part of withdrawing that. He was a part of notifying the journal and taking action on that. Every other paper, not one of them, was ever withdrawn. And the NIH gave Dr. Rao, he was one of the top researchers in the country in terms of being able to bring in NIH federal funds for brain cancer research. And that's the testimony at the trial. Nobody questioned his talents. And nobody, I've never heard that testimony before, that nobody ever quoted or cited to his papers. On the offer of proof issue, when you say, I want to call a witness, because the witness is going to say what that witness just testified to is false, that's impeachment. That's impeachment. And we were very clear on what the offer of proof was, that he was going to say that nothing bad, he knew nothing bad of Dr. Rao from that investigation, but he knew a lot of bad things about Dr. Gandhi. And there's a document that's in the record, and it's referenced in our brief as well, where their own investigators, the investigators that they brought in, they had the same statements by Dr. Santoro. And in their own report, it says Dr. Santoro told Dr. Rush about Dr. Gandhi's misconduct, intentional misconduct, and that Dr. Rao didn't know about it. So it was obviously to impeach Dr. Rush. An offer of proof was made twice at the trial, and that's in addition to his deposition transcript being provided to the court on summary judgment, which was ruled on three weeks earlier. So the court knew what Dr. Santoro's testimony was going to be, she just didn't allow us to bring it in. With regard to the jury instruction, we asked specifically, we raised the issue, this concern that we're raising now, that it wasn't clear that the definition of knowingly, which allows for blind eye condoning approval, we raised it, and it's referenced in the brief. We raised it before trial, during trial, repeatedly, and said it's just not clear. It should be clear so the jury knows that each of those elements, the knowingly definition applies repeatedly, rejected repeatedly by the trial court. She chose just to have it apply to one element, not sure why. With regard to the state of mind evidence, notice of appeal number four addresses that issue, but it was obviously fully briefed during the trial when this evidence was coming in, and this is found at docket 328, page 139. We said, we want our client, we want Dr. Rao, to be able to testify that he wasn't worried about a hearing. He wanted a hearing, because he knew he could show that he was being unfairly targeted. And they were handling, they handled his case like no other case. And some of the things that we listed in our brief, the research integrity program, it's a process that starts with an inquiry panel. They did not give the inquiry panel an explanation that he had provided from one of the researchers, explaining that what they thought were errors weren't errors. They didn't look at the raw data. You can't look at images in a scientific paper like these and tell whether there's an error or not with the naked eye. You need to look at the raw data. They never looked at the raw data. The inquiry panel never even interviewed him. The inquiry panel, there was a document submitted to the inquiry panel by Dr. Grabner, and Dr. Grabner admitted that, he said it was from the Dean's Special Committee. The Dean's Special Committee member said, I've never seen it before. And it resulted in expanding the research inquiry from five papers to 18 papers. And they never told Dr. Rao that they were expanding it, although they were required to do so under their own process. And it goes on and on. A lot of those allegations also supported the discrimination, because we had evidence of other people outside of his national origin who weren't Indian, that were allowed to provide information, and that were treated in a different manner. So we greatly appreciate your time, and thank you very much again. Thank you, Ms. Major. Thank you, Ms. Mazur. Case is taken under advisement.